CANTON ROLL & MACHINE CO. v. ROLLING MILL CO. OF AMERICA et al.

STURGISS et al. v. SAME.

(Circuit Court, N. D. West Virginia. August 2, 1907.)

No. 654.

**1.** FRAUDULENT CONVEYANCES—JURISDICTION OF FEDERAL COURTS—CONDITIONS PRECEDENT.

Section 8 of the judiciary act of March 3, 1875 (18 Stat. 472, c. 137 [U. S. Comp. St. 1901, p. 513], relating to local suits to enforce liens, etc., does not enlarge the right of an individual to sue, and confers no right upon a simple contract creditor to maintain a creditors' suit in a federal court to set aside an alleged fraudulent conveyance of property by the debtor, nor does the fact that complainant has an alleged mechanic's lien upon the property afford basis for such a general creditors' suit, since such lien, if valid, may be enforced in rem against the property, regardless of conveyances, whether prior or subsequent.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 24, Fraudulent Conveyances, § 697.]

**2.** MECHANICS' LIENS—SUIT TO ENFORCE—SUFFICIENCY OF BILL.

A bill in equity to enforce a mechanic's lien must allege every fact essential to the right to such lien with accuracy and clearness, so that issue may be taken thereon; and a mere allegation that complainant has filed and is entitled to such a lien is insufficient.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 34, Mechanics' Liens, § 494.]

**3.** FRAUDULENT CONVEYANCES—ACTION TO SET ASIDE—CREDITORS' SUIT—RIGHT TO MAINTAIN—ESTOPPEL.

A creditors' suit to set aside an alleged fraudulent conveyance of property from one corporation to another and alleged fraudulent issues of bonds by the latter, creating apparent liens upon the property, cannot be maintained after the complainant has sold or assigned its claim to one who advised and was instrumental in bringing about such transfers and participated therein as a stockholder of the purchasing corporation, and is therefore estopped to deny their validity or good faith.

**4.** MECHANICS' LIENS—SUIT TO ENFORCE—SUFFICIENCY OF EVIDENCE.

Mere allegation and proof that machinery sold by complainant was to be placed or used in a mill are not sufficient to sustain a suit to enforce a mechanic's lien therefor under the statute of West Virginia giving a lien for the price of "machinery for constructing, altering or repairing a house, mill * * * or other structure," without further proof that such machinery was intended to be and was so used as to become a part of the realty.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 34, Mechanics' Liens, § 51.]

5. SAME—FILING OF CLAIM—ESTOPPEL.

Under a statute requiring a claim for a mechanic's lien to be filed within a stated time after the claimant "ceases to labor or to furnish material or machinery," where a claimant has filed a sworn statement as required, fixing the date when he ceased, he is estopped thereby, and cannot, by a subsequent statement fixing a later date, extend the time for claiming a lien.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 34, Mechanics' Liens, §§ 275, 276.]

6. SAME—VALIDITY—TIME FOR FILING.

A complainant contracted to sell to a corporation certain machinery of a tin plate mill, including a number of rolls to be delivered absolutely and a further number to be delivered, if required by the purchaser. The purchaser transferred its property to another corporation, and was dissolved, and its successor, after completing the mill, was adjudged bankrupt. In the meantime complainant delivered the first number of rolls to the succeeding corporation, and filed a claim for a mechanic's lien therefor, but dismissed a suit to foreclose the same because it was found to have been filed too late under the statute. Thereupon, with knowledge of the dissolution of one corporation and the bankruptcy of the other and without orders, it shipped the additional number of rolls, and filed another claim for a lien, including the entire amount, although the rolls last shipped were not received nor placed in the building. Held, that its claim was invalid, not only because the machinery was not so used, and could not therefore be the basis for a lien, but also because its shipment was unauthorized, and could not operate to extend the time for filing a lien for that previously furnished.

7. ESTOPPEL—PERSONS AFFECTED—PERSON ACTING AS ATTORNEY.

One who was attorney for a corporation and its stockholders in suits brought against them to set aside an alleged fraudulent sale of bonds and prepared the answers denying the fraud cannot himself, after the suits have been dismissed and he has become the owner of the claims sued on, attack the validity of the same transaction in another similar suit.

8. SAME—GROUNDS—POSITION IN JUDICIAL PROCEEDINGS.

A trustee in bankruptcy of a corporation who intervened in suits against the company, and by sworn answers affirmed the validity and good faith of certain of its transactions, is estopped to shift his ground in a subsequent suit, begun after the dismissal of the prior ones, and attack the validity of the same transaction.

In Equity.

On June 20, 1904, the Canton Roll & Machine Company, a Pennsylvania corporation, filed its bill in its own behalf and in behalf of all other creditors of the Rolling Mill Company of America who might join therein in this court against the Rolling Mill Company of America, a New Jersey corporation, the Morgantown Tin Plate Company, a West Virginia corporation, Hector M. Hitchings, Melvin J. Palliser, W. J. Logan, Jacob Meurer, Dick S. Ramsey, Andrew Meurer, August Kuhnla, Charles Merrill, W. H. Wells, J. L. Prescott, Wendell J. Wright, and C. H. Young, citizens of New York, in which it alleges: That the Rolling Mill Company of America acquired in the month of May, 1902, a tract of land near Morgantown, W. Va., of about 16 acres, conveyed to it by George C. Sturgiss and wife, by deed dated December 9, 1902. That, after obtaining title, it proceeded to erect a tin plate plant thereon, entering into various contracts for construction and machinery, and incurring large indebtedness. That, among others, it entered into a written contract with plaintiff on December 5, 1901, for the purchase of six hot tin mills complete, six stands of cold mills complete, and other machinery at an agreed price of $35,000. That plaintiff has fully performed said contract furnished the machinery, and has been paid thereon all of the contract price except $14,889.98, which, with interest from March 23, 1904, remains due and unpaid, and for which repeated demand for payment has been made. That said

Rolling Mill Company of America is indebted to others for labor and machinery, and that, being so indebted, it sought and undertook to strip itself of all its property and assets by selling and conveying said property to the Morgantown Tin Plate Company, and fraudulently to distribute the proceeds of sale among its stockholders without paying its said debts. That, pursuant to such fraudulent scheme, it on or about December 19, 1904, did convey and transfer its real estate and plant to said Morgantown Tin Plate Company in consideration of $150,000 of stock of the latter company fully paid, issued direct to the stockholders of the Rolling Mill Company of America, without first paying the indebtedness; that the individual defendants named were at the time of such transfer stockholders of the Rolling Mill Company of America, and Hitchings, Logan, and Wright were directors thereof. That all of said stockholders conspired to commit said fraud, participated therein, and received the benefits thereof. That the stockholders of the Morgantown Tin Plate Company were the same as those of the Rolling Mill Company; that subsequently the Morgantown Tin Plate Company executed a deed of trust to the Federal Savings & Trust Company, as trustee, to secure $150,000 of its bonds, bearing date January 1, 1903, which deed of trust was duly recorded. That the execution of this deed of trust was a further step in the scheme to defraud plaintiff and other creditors, and place the property of the Rolling Mill Company beyond reach of its creditors. That of said bonds, $100,000 in value, were never sold, but were pledged for an alleged indebtedness of the Morgantown Tin Plate Company, amounting to a little over $20,-000, and the creditor holding the same as collateral about October, 1903, sold or pretended to sell them at auction in New York City for $22,500. That plaintiff is not informed as to who was the purchaser of these bonds, but he believes such purchaser to be one of the individual defendants or some one holding for their benefit, and it is charged that all of the bonds for $150,-000, not held by bona fide holders for value, without knowledge of the illegality, are void. That plaintiff is entitled to and has filed a mechanic's lien against the real estate and plant for its debt and claims a lien thereon by virtue thereof; that each and every creditor of the Rolling Mill Company has an equitable lien upon said property prior to the lien of the trust deed and bonds, except in so far as said bonds are in the hands of bona fide holders for value and without notice of the fraud charged. The prayer of the bill is that plaintiff may be decreed a lien against the land and plant for its debt prior to the mortgage or deed of trust and to all other liens; that bonds secured by said deed of trust be decreed null and void as to creditors of the Rolling Mill Company, excepting only in so far as held by bona fide purchasers for value without notice of the illegality thereof; that liens and claims be ascertained and fixed according to priorities, and be enforced by sale of the land and plant and a distribution of the proceeds; that the individual defendants be decreed liable for and to pay the plaintiff's and other debts of the Rolling Mill Company; that a receiver be appointed, and for general relief.

On November 4, 1904, the defendants, the Rolling Mill Company of America, Jacob Meurer, Hector M. Hitchings, Melvin G. Palliser, Dick S. Ramsey, Wendell J. Wright, C. H. Young, W. J. Logan, and Andrew Meurer, filed their joint and separate answer to this bill, in which they in substance aver: That the Rolling Mill Company was organized under the laws of New Jersey for the purpose of building and operating a plant at Connellsville, Pa., and had commenced the construction of its plant there and expended $17,000 in cash and had in its treasury $100,000 less the $17,000 so expended, when George C. Sturgiss made it a proposition that if a new company should be organized, known as the Morgantown Tin Plate Company, and the plant located at Morgantown, he would procure certain coal lands, gas rights, railroad contracts for cheaper rates and a more favorable charter. These grants and privileges it was estimated would be of $20,000 value, and, in addition, he proposed to pay a bonus of $20,000 to pay for amount expended at Connellsville, and take $50,000 in bonds of the new company. That this proposition was accepted. The new company known as the Morgantown Tin Plate Company was organized. Sturgiss turned over $20,000 in cash and land estimated to be worth $20,000 to $25,000, and the freight and gas contracts and the coal

option as he had proposed. That this contract for organizing anew and transferring the plant was entered into in good faith with no purpose to defraud, and that it was greatly to the benefit instead of to the detriment of creditors of the Rolling Mill Company of America. That all rights and property of the Rolling Mill Company of America were transferred to the Morgantown Tin Plate Company, which latter company assumed all the obligations and liabilities of the former. It is denied: That the Rolling Mill Company acquired title to the land, but, on the contrary, it is charged such title was acquired by the Morgantown Tin Plate Company. That the plaintiff was fully cognizant of these transactions, and, while its contract was with the Rolling Mill Company, yet it, being fully acquainted with the transfer of property and the assumption of contracts, obligations, and liabilities on the part of the Morgantown Tin Plate Company, delivered to the latter all the machinery and materials and received from the latter all the moneys paid on account thereof, and all its business transactions, relations and dealings were had with the Tin Plate Company. That plaintiff knew fully that the Rolling Mill Company had been succeeded by the Tin Plate Company, and that the latter had placed the trust mortgage on the property for $150,000 and had knowingly received proceeds of the bonds. Such acquiescence in the transfer of the rights and property of the Rolling Mill Company to the Tin Plate Company on the part of the plaintiff is charged to be an estoppel of any right on its part to assail the same. It is denied that the Rolling Mill Company acquired the land; that it entered into the various construction and machinery contracts or incurred large indebtedness but that the Tin Plate Company did; that the indebtedness of $14,889.98 claimed by plaintiff is not correct, but only $11,089.98 is due, and $3,800 more than is due is claimed under the contract. It is admitted that the Rolling Mill Company entered into the contract for machinery with the plaintiff, and by its terms it is charged plaintiff was to furnish twelve pair of chilled rolls, six pairs of which were to be delivered without condition or further order, but the remaining six were not to be delivered until required by the purchaser, which provision of the contract constituted a conditional sale of these last six pairs of rolls depending entirely upon future order for delivery, and that the same never were directed to be delivered, but, on the contrary, plaintiff by letter directed to the Tin Plate Company inquiring as to such delivery was, in reply, absolutely instructed not to deliver said rolls. That said rolls were shipped by plaintiff nevertheless, but were not accepted or received, and the same, so far as known, remain in the railroad yards at Morgantown unaccepted, and, for payment of same, defendants are not liable. It is denied that the Rolling Mill Company is indebted to any one, but it is admitted that the Tin Plate Company is indebted to the extent of about $35,000, inclusive of plaintiff's debt. It is denied that any fraud was committed or intended by either the Rolling Mill Company, or by the individual defendants as directors and stockholders thereof, or that it stripped itself of its property and assets for the purpose of defrauding its creditors, or that it had at the time any creditor or debt outstanding, save and except the one due plaintiff, which was assumed by the Tin Plate Company, which latter company, with the full consent of plaintiff, took over the Rolling Mill Company's property and assumed its contracts and debts, whereupon the Rolling Mill Company was regularly dissolved under the laws of New Jersey, the state from which its charter emanated. The execution of the mortgage trust deed upon the estate and plant of the Morgantown Tin Plate Company is admitted, but it is denied that it was executed for the purpose of injuring or defrauding any one, but, on the contrary, its sole purpose was to obtain money to enable said company to continue and complete construction and permit operation for the benefit of stockholders and creditors, That this mortgage was made and recorded with full knowledge of the plaintiff, $50,000 of its bonds were taken and paid for by Sturgiss, and the proceeds thereof were expended in paying debts. Part thereof was applied to plaintiff's debt, and was received by it with full knowledge that it was part of the proceeds of these bonds. That one of the strong reasons for removing this plant and reorganizing under West Virginia law was the fact that these bonds would thus be taken, and it was expected a large part of the balance would be taken by the citizens of Morgantown. That at the time it was im-

possible to manufacture tin plate at a profit, and no outsider could be induced, to take the bonds, and the company, being in financial straights, secured from, the Kings County Trust Company a loan of $20,000, and the $100,000 of bonds remaining unsold were put up as collateral to secure this loan. That this, transaction was in every way bona fide, and the money so borrowed was for-, warded to Morgantown Tin Plate Company and used by it in payment of its bills. Nevertheless, the company's financial condition becoming worse, this loan was called by the Kings County Trust Company. The Tin Plate Company could not pay it. In consequence said bonds were sold at public auction in New York City to a person charged to be in no wise connected with the company for $22,500. It is denied that the defendants or any one of them purchased these bonds, or had or has any interest in such purchase, and all allegations of fraud in connection with the transaction are denied. It is denied that plaintiff has any valid mechanic's lien upon the property for its debt under the laws of West Virginia, but, on the contrary, it is alleged in effect that plaintiff undertook to acquire such lien, but, it being found long, after the time had expired within which such lien could be filed for record that the lien attempted to be taken was void on its face, the plaintiff, contrary to order and without right, undertook to forward the six pairs of rolls only conditionally bought, in order to furnish it a basis and pretense to file another lien of record, dated from the day of this last unwarranted shipment. The equitable lien claimed by the plaintiff is denied, the personal liability of the individual defendants is denied, and it is finally charged that the Morgantown Tin Plate Company is, and was at the time of the institution of this suit, in bankruptcy with a trustee appointed by the bankrupt court in charge of the property, and it is insisted that plaintiff could and did have full remedy in the latter court to litigate its claim. To this answer replication was filed in the clerk's office and motion subsequently made to strike it from the files as not properly filed in time.

On March 8, 1905, Frank P. Corbin, trustee in bankruptcy for the Morgantown Tin Plate Company, filed an answer to plaintiff's bill, in which he says, while not named a defendant, he has been served with process requiring such answer from him. This answer substantially reiterates the allegations in different form of the joint answer of defendants above referred to, except in certain particular hereinafter set forth. Touching the organization of the Morgantown Tin Plate Company and the transfer of the assets and property of the Rolling Mill Company of America to it, this answer makes substantially the same statements of fact and the same denials of all fraud or fraudulent purpose or intent therein. It admits the execution of the contract by the Rolling Mill Company with plaintiff, but denies the sum claimed by plaintiff to be correct, says all payments were made by the Tin Plate Company, and that the shipments were largely, if not altogether, made by plaintiff to the latter company. It denies the Rolling Mill Company to be at all indebted to plaintiff or any one else, but charges all debts to be due from the Tin Plate Company and that these debts are about $45,000. It clearly and fully sets forth, in accord with the other answer, the facts of the formation of the Tin Plate Company, the transfer and conveyance of the real estate and plant to it in consideration of $150,000 of its capital stock issued to the stockholders of the Rolling Mill Company, and that for this $150,000 was received by the Tin Plate Company the real estate, the machinery, and machinery contracts, the residue unexpended of $100,000 paid into the Rolling Mill Company's treasury as stock subscriptions, the $20,000 bonus paid by Sturgiss, the contracts for freight rates, coal lands, gas, and other rights and privileges which respondent trustee charges were of a prospective value largely in excess of $150,000, and the further consideration was passed whereby the Tin Plate Company assumed all debts and liabilities of the Rolling Mill Company. Touching the mortgage, it agrees substantially with the answer of the other defendants herein referred to, as to the reasons for its execcution, that it was executed without fraud or fraudulent intent, and with full knowledge on the part of plaintiff, who made no shipments of material or machinery until after the recordation of the deed to the Morgantown Tin Plate Company and the recordation of this mortgage by the latter to the Federal Trust Company, and that the plaintiff and all other creditors of the Rolling Mill Company ac-

cepted the Tin Plate Company as paymaster, received payments from it, and charges them all to be estopped from denying this acceptance, and of having had full notice of such transfers. Touching the hypothecation and sale, however, of the $100,000 of bonds, this respondent, trustee, assails the same, charging, in effect, that these bonds were sold for $22,500 to one A. K. Bolan, not a bona fide purchaser, but a holder of the same for stockholders, officers, and directors of said Tin Plate Company, and that the hypothecation and sale was in fraud of the rights of creditors and stockholders. His charges, in substance, are based on information and belief, the fact that the name of the purchaser was not disclosed, and he believes certain of the stockholders named caused the hypothecation and the sale to be made thereunder without due notice and advertisement thereof, although the bona fide existence of the loan of $21,500 for the payment of which these bonds were so hypothecated is not disputed or denied.

This answer further joins in denying the validity of the mechanic's lien or other equitable lien claimed by plaintiff, charging that plaintiff filed a pretended lien for that purpose, instituted suit to enforce it, recognized in the progress thereof that such declaration, not conforming to the requirements of the West Virginia statute, was void, and dismissed the suit, and then almost a year after work on the plant of the Morgantown Tin Plate Company had ceased, and about a year after it had been notified by the Tin Plate Company not to ship further materials, had acknowledged said notice, and complied therewith, said plaintiff proceeded to ship to the Rolling Mill Company, an extinct corporation, certain material conditionally bought under terms of the contract solely for the purpose of enabling it to file another declaration of lien including the real account due it, time for securing which by such lien had long since expired. That this shipment was not made until after bankruptcy proceeding had been commenced against the Tin Plate Company, the true owner of the plant and mill. That such material was never delivered at the plant or mill, but is piled up in the railroad yards at Morgantown. He closes by asking that the sale of the $100,000 bonds be set aside as fraudulent, and the sum of $22,500 paid therefor be allowed as a common unsecured debt.

On the 14th day of March, 1906, George C. Sturgiss, and the Farmer's Deposit National Bank of Pittsburg, filed a joint petition in this cause, in which it is alleged, after reciting in substance the pleadings in the cause: That Sturgiss purchased $50,000 of the bonds at par value, paid $20,000 agreed bonus for removal of plant, and for the purpose of protecting his investment since the Tin Plate Company suspended operations and became involved, and after commencement of this suit had purchased a number of liens and claims against the company and property, among which were the lien and claim of the Canton Roll & Machine Company for $14,889.98 (the plaintiff's demand involved in this suit), the lien and claim of the Hoovens, Owens, Rentschler Company for $13,868.09, amounts owed to George J. Humbert $3,746.47, W. L. Sutherland $426.00, W. C. Voight $164.50, and Mike Sarbo $156. That said Tin Plate Company was also indebted to Sturgiss for $17,450 for cash bonus paid by him, the consideration for which wholly failed. That after acquiring these claims and additional ones of the Northern Electrical Manufacturing Company of $1,042.75, and the Dunbar Fire Brick Company of $952.24, he, Sturgiss, borrowed from his co-petitioner bank a large sum of money, and to secure such loan assigned and transferred each and all of said claims to the said bank, as collateral security, in writing, except the last two to the Northern Electrical Manufacturing Company and Dunbar Fire Brick Company, and it is alleged all said claims so assigned have been proved before the referee in bankruptcy, and the bank is entitled to collect same, subject to Sturgiss' equity therein upon payment of his debt to it. It is then charged in this petition: That the Hoovens, Owens, Rentschler Company claim arose from the sale by it to the Rolling Mill Company of several Corliss engines and other machinery which was installed in the plant of the Tin Plate Company. That this sale was a conditional one in writing, reserving title until property was paid for. That in the bankruptcy cause against the Tin Plate Company an order was entered December 5, 1904, that the property should be sold free of liens, and on March 30, 1905, it was sold and purchased by said Sturgiss for $200,200,

which sale was confirmed, and that the proceeds arising from said sale were in the bankruptcy court's registry to probably more than $194,000, after paying costs and expenses, and to pay the bonds and interest would require $177,000. That petitioners are interested in and insist upon the cancellation at least of so much of the $100,000 bonds as exceeds the $21,500 for which they were hypothecated and sold. They ask to be made parties; that a first lien on the funds arising from the sale of the property be declared for the original demand of plaintiff now owned by them; that a lien be declared in their favor for Hoovens, Owens, Rentschler Company claim; that the $50,000 of bonds bought by Sturgiss be paid to them with interest; that the remaining $100,000 thereof be wholly canceled; that their petition be considered as a cross-bill; that this court settle all rights, priorities, interests, liens, and claims in the order in which the same are entitled to be paid.

On October 5, 1904, there was lodged in the clerk's office, and indorsed as filed by the clerk, a written demurrer to the original bill, not sworn to or certified to by counsel, by the defendants who subsequently, on November 4, 1904, filed the answer hereinbefore referred to, in which demurrer they allege the bill not sufficient in law, no sufficient cause of action to be stated therein, and no cause for liability as against defendants to be shown. This demurrer was by order of May 29, 1907, stricken out. On April 8, 1906, was filed by all the defendants, except Corbin, trustee, a written demurrer, properly certified to by counsel, to the petition of George C. Sturgiss and the Farmers' Deposit National Bank, in which it is charged that this court has no jurisdiction of the cause of action, in that all plaintiffs are not citizens of the same state, all parties defendant are not citizens of the same state; that all parties plaintiff do not have a lien upon the real estate set out in the bill and petition; that none of the parties plaintiff have exhausted their remedy at law by obtaining thereat judgment and execution; that on the face of the bill sufficient facts are not stated to constitute cause of action; that the Federal Trust & Savings Company, trustee in the $150,000 mortgage, and the Kings Couny Trust Company, to whom the $100,000 of bonds were hypothecated, are necessary parties; that a misjoinder of actions appears to establish a mechanic's lien to set aside mortgage and bonds and to assert personal liability of stockholders; that the bill fails to show that plaintiffs have tendered back to the purchaser of the $100,000 of hypothecated bonds the sum paid by him therefor, or facts sufficient to show that the hypothecation and sale thereof was illegal, or was then or now of any actual value, or that the property conveyed in exchange for the stock was not its full value, or that the Tin Plate Company is not liable for all the debts, or that it has not sufficient assets to pay the same. To the joint answer of the Rolling Mill Company and others and of Corbin, trustee, replications were filed, subsequent motion was made to strike out the replication to the former as not filed in time, depositions were taken, motions made by plaintiff and petitioners to extend time to take such by plaintiff and by defendants to suppress those already taken by plaintiff and petitioners. These motions to strike out replication and suppress depositions were overruled, and the time was extended to take depositions with right to defendants further to cross-examine certain witnesses introduced by plaintiffs.

A. Leo Weil and B. M. Ambler, for plaintiffs.
Reese Blizzard and Hector M. Hitchings, for defendants.

DAYTON, District Judge (after stating the facts). Every proposition involved in this case has been so bitterly, and, I may say so ably, contested by counsel that upon my former considerations of it I thought it best to postpone all questions of demurrer and other technical objections until final hearing. Nevertheless, I have had grave doubt all along as to whether this bill could be maintained for many, if any, of the purposes for which brought. It is earnestly insisted by counsel that the bill is warranted by section 8 of the jurisdictional act of March 3, 1875 (18 Stat. 472, c. 137 [U. S. Comp. St. 1901, p.

513]), allowing suits "to enforce a legal or equitable lien upon, or claim to, or to remove any incumbrance, lien, or cloud upon title to real or personal property" to be brought in the district where such property is. This statute clearly does not enlarge the right of the individual to bring suit, where before he had no right to sue, but simply allows him, if he has right of action, to bring it in loco rei sitæ. The cases of Scott v. Neely, 140 U. S. 106, 11 Sup. Ct. 712, 35 L. Ed. 358; Cates v. Allen, 149 U. S. 451, 13 Sup. Ct. 977, 37 L. Ed. 804, and Hollins v. Brierfield Coal & Iron Co., 150 U. S. 371, 14 Sup. Ct. 127, 37 L. Ed. 1113, were all decided long since the passage of the act of 1875, and all distinctly hold that no simple contract creditor can maintain in federal courts, under and by virtue of state statutes or otherwise, a suit in equity to set aside as fraudulent a conveyance by his debtor of property, because to allow him to do so would contravene the seventh amendment to the Constitution of the United States, guaranteeing to the defendant, where the amount in controversy exceeds $20, the right of trial by jury to test the validity of such debt demanded of him. If the statute of 1875 did have the scope contended for by plaintiff's bill, it would under these decisions be unconstitutional and void; but to my mind, as above stated, it has no such scope or purpose. I have no doubt that in the preparation of the bill the right of plaintiff to assail, before judgment obtained, alleged fraudulent conveyances, was misconceived, and that its purpose was to rely upon this supposed right. It is true, I think, that a suit in equity can be maintained in the federal court to enforce a mechanic's lien. In Scott v. Neely, supra, Justice Field says:

"It is the existence, before the suit in equity is instituted, of a lien upon or interest in the property, created by contract or by contribution to its value by labor or material, or by judicial proceedings had, which distinguishes cases for the enforcement of such lien or interest from the case at bar."

See, also, Sheffield Furnace Co. v. Withrow, 149 U. S. 574, 13 Sup. Ct. 936, 37 L. Ed. 853; Idaho, etc., Co. v. Bradbury, 132 U. S. 509, 10 Sup. Ct. 177, 33 L. Ed. 433; Davis v. Alvord, 94 U. S. 545, 24 L. Ed. 283.

But this last case, to an extent at least, defines the extent to which suit can go in the enforcement of such lien, to wit, that it is "a suit in equity, requiring specific directions for the sale of the property, such as are usually given upon the foreclosure of mortgages and the sale of mortgaged premises." It is to be remembered that this lien is not a general one like a judgment, binding the property generally of the debtor therein; but, on the contrary, is a limited one against a specific piece of property, and may, according to circumstances, involve no personal liability upon the owner of the property. The holder of such lien can be interested only to the extent of the specific property itself and the order of priority of his lien thereon. If such lien has, by compliance with the requirements of law, attached to the property, it is immaterial to the holder what mortgage or judgment liens may thereafter attach to it, and, I conceive, it is likewise ordinarily immaterial to him what conveyances, fraudulent or otherwise, may be made of the property. In other words, such conveyances cannot affect this specific lien, affecting not the individual, but attaching solely ad

rem, unless such conveyances are made subsequent to the attachment of such lien, and it would be under most extraordinary circumstances, hard to conceive of, if such prior conveyances were duly recorded, and notice thereof thereby given, that the holder of such mechanic's lien could assail them. I am fully persuaded that he cannot in the federal courts, by reason of this limited lien alone, undertake to bring a general creditors' bill, assailing conveyances and seeking to charge defendants individually for alleged personal fraudulent transactions. Again, while these liens must be liberally construed, the statutory provisions by which they are obtained must be strictly complied with, and the claimant thereof in the suit brought to enforce it must prove "all that is essential to the creation of the lien, and that includes proof of the commencement of the work, of its character, and its completion. The commencement of the work must be shown, for from that date the lien attaches, if at all. The character of the work must be shown, for it is not for all kinds of work that a lien is allowed. The completion of the work must be shown, for notice of claiming a lien must be filed in the recorder's office within 60 days from that time. This proof must be furnished by the party who asserts the existence of the lien." So says Mr. Justice Field, in Davis v. Alvord, 94 U. S. 545, 24 L. Ed. 283.

The single allegation contained in plaintiff's bill asserting such lien is in these words:

"(13) Your orator is entitled to and has filed a mechanic's lien for all its said claim of $14,889.98, with interest as aforesaid, against said real estate and manufacturing plant in accordance with the laws of the state of West Virginia, and claims and is entitled by virtue thereof to a lien on said property."

Nothing can be better settled than the principles that every bill in equity must state the right, title, or claim of the plaintiff with accuracy and clearness; that every essential to the plaintiff's title to maintain the bill and obtain the relief must be stated in the bill, otherwise the defect will be fatal; that no facts are properly in issue unless charged in the bill; that every material allegation should be put in issue by the pleadings, so that the parties may be duly apprised of the essential inquiry, and may be enabled to collect testimony in order to meet it; and that the bill must show sufficient matters of fact per se to maintain the case, and, if it be defective in this, the bill will be dismissed. Sand's Suit in Equity 10; Story's Eq. Pl. 284; Mitf. Eq. Pl., 125; Parker v. Carter, 4 Munf. (Va.) 273, 6 Am. Dec. 513; McGugin v. O. R. R. Co., 33 W. Va. 63, 70, 71, 10 S. E. 36.

Standing alone upon this single allegation and statement of fact in this bill, I have not believed plaintiff could maintain this suit to assert its claim as a mechanic's lien. This allegation states the bare fact that it is entitled to and has filed a mechanic's lien; but does not state when it filed it or where or any other essential facts showing whether it be in such form and substance as to constitute it such lien in fact. It is true that on June 19, 1906, by leave of the court, plaintiff was permitted and did file in the cause what purports to be the record of such lien relied on from the clerk's office of Monongalia county, W. Va., but this was two years after the bill was filed, after Sturgiss and his

co-petitioning bank had intervened, and after original defendants had filed their demurrer to this petition going, in its nature, to the bill also. Unidentified and not referred to or brought in by any amendment either made, asked or in any way sought to be made to the bill, I cannot believe that it can be regarded as curing the defective allegations or lack of allegations therein. It would follow that if I be right in these conclusions that the bill cannot be maintained on its face to enforce a mechanic's lien, and cannot be maintained by plaintiff on the other hand as a simple contract creditor to assail the alleged fraudulent transfers, ordinarily it would seem that I would not be called on to further consider the matter. But this position is, however, so strenuously resisted by so able counsel, and the other questions involved have been so earnestly and extendedly discussed, that I feel compelled to say that, if I should be wholly mistaken in the foregoing conclusions that the bill cannot be maintained and should substantially fall on demurrer, nevertheless, that, on the merits, I do not believe the plaintiff and the intervening petitioners are entitled to the relief prayed for by it and their petition. It seems to me clear that this controversy no longer exists between the original plaintiff in interest and the defendants; that its claim has either been paid by or assigned to petitioner George C. Sturgiss; that the allegations of the original bill charging the transfer of the property of the Rolling Mill Company of America to the Morgantown Tin Plate Company to be fraudulent must fall and drop out of the case, for it is conceded that the organization of the Tin Plate Company and the transfer to it from the Rolling Mill Company of its property and assets was not only known and consented to by Sturgiss, but that all the papers and proceedings necessary to accomplish this result were either prepared or supervised by him as attorney for the parties interested in the two companies; and it is further admitted that he, by transfer from Humbert upon the organization of the Tin Plate Company, became a stockholder of the Tin Plate Company; that he consented to be one of its original incorporators, but was not finally called upon to be such. Under such condition of affairs, it being uncontroverted that he owns the plaintiff's debt, either by assignment or payment, and that this creditor alone has made these charges of fraud, it would be a matter of supererogation to cite authorities to the effect that he is estopped from maintaining himself or having his assignee maintain them for his benefit. Nor is it denied that the mortgage or deed of trust was also advised by him and prepared under his supervision and that he subscribed and took bonds to the amount of $50,000 secured thereby, with full knowledge of all the facts and conditions under which it was executed, and therefore is also estopped from further maintaining the allegations of the bill charging this mortgage or deed of trust to have been executed for fraudulent and corrupt purposes. And, finally, it is admitted that the stock of the Tin Plate Company was issued to the extent of $150,000 to the stockholders of the Rolling Mill Company, with his full knowledge and assent, if not under his direction, in payment of assets and property transferred by the latter to the former company, a part to Humbert from whom he, Sturgiss, took part, and he is therefore estopped, either directly or through his co-petitioner bank, his assignee,

from seeking to hold said stockholders personally liable for the payment of his debt by reason of the alleged fraudulent issue of this stock to them.

Under these circumstances the controversy narrows itself down to two questions upon its merits: First. Can the cause be maintained for the benefit of petitioner Sturgiss to assert a valid mechanic's lien against the property for the debt originally set up in the bill by his assignor, the Canton Roll and Machine Company? Second. Can it be maintained at his instance and for his benefit, and possibly that of other creditors represented by Corbin as the trustee of the Morgantown Tin Plate Company in the bankruptcy proceeding, to assail and set aside the sale in New York of the $100,000 of bonds deposited as collateral with the Kings County Trust Company to secure the notes of the Tin Plate Company for $21,500 borrowed money?

Taking up the first question, there very naturally arises at the very threshold of the inquiry this question: Is it sufficiently shown in the bill, pleadings, or evidence that the machinery furnished was of the character that entitled the plaintiff to a lien? If it can be asserted at all, it must be by virtue of section 3111 of the Code of West Virginia of 1906, which reads as follows:

"Every mechanic, builder, artisan, workman, laborer, or other person, who shall perform any work or labor upon or furnish any material or machinery for constructing altering, repairing or removing a house, mill, manufactory, or other building, appurtenances, fixtures, bridge, or other structure, by virtue of a contract with the owner or his authorized agent, shall have a lien to secure the payment of the same, upon such house or other structure, and upon the interest of the owner in the lot of land on which the same may stand or to which it may be removed."

It will not be contended by any one that this statute can be construed to give a lien to the man who may sell, under contract, the furniture that may go into a house, nor can it be any more seriously contended that this lien can be taken for tools and machinery to be operated in the house, unless they become part and parcel of the structure itself. There is no substantial evidence that I recall in this case that shows that this machinery furnished by plaintiff was to be attached to and made a part of the realty so as to authorize this lien. It might naturally be assumed that some of the heavy machinery was so attached, and, on the other hand, the presumption arises just as strongly that some of it was not to be so attached. For example: The contract provides for twelve pairs chilled rolls, six pairs to be delivered with the mills, balance when required. Manifestly to one unacquainted with these mechanical details it would be assumable that, whether the "mills" were to be incorporated with the structure or not, the rolls could not be, because they could be supplied independently at any time, and as needed. I confess myself in entire ignorance touching this class of machinery, and it certainly cannot be contended that courts must take judicial knowledge of such matters. On the contrary, the burden is upon the person asserting such lien fully to prove the facts and establish the character of the machinery or work; for it is not for all kinds of such that a lien is allowed, as decided by Davis v. Alvord, supra.

In Van Stone v. Stillwell & Bierce Mfg. Co., 142 U. S. 128, 12 Sup. Ct. 181, 35 L. Ed. 961, Mr. Justice Lamar says:

"This lien is a creature of the statute, not recognized at common law. It may be defined to be a claim created by law for the purpose of securing a priority of payment of the price and value of work performed and materials furnished in erecting or repairing a building or other structure, and as such it attaches to the land as well as the buildings thereon. 15 Am. & Eng. Enc. Law, 5. Now, it is not the contract for erecting or repairing the building which creates the lien, but it is the use of the material furnished and the work and labor expended by the contractor, whereby the building becomes a part of the freehold, that gives the materialman and laborer his lien under the statute."

The same principles and conclusions are deducible from the rulings of the Circuit Court of Appeals of this circuit in the cases of Liberty, etc., B. & L. Co. v. Furbush & Son Machine Co., 26 C. C. A. 38, 80 Fed. 631. Withrow Lumber Co. v. Glasgow Inv. Co., 42 C. C. A. 61, 101 Fed. 863, both of which cases arose under the Virginia statute very similar to ours. In the latter case it was attempted, as in this case, to set up an "equitable lien" independent of the mechanic's lien law, but the court expressly holds no such lien has existence at common law or equity except by statute for material or labor furnished. In this case both the validity and existence of this lien were denied and put in issue by the answers. It would therefore appear that the case of Central City Brick Co. v. Norfolk & W. R. Co., 44 W. Va. 286, 28 S. E. 926, is decisive of the point that the mere declaration of the lien on record was not sufficient proof. The Supreme Court of Appeals of this state, without dissent, therein held:

"It is not sufficient to file with such a bill the account filed with the clerk of the county court for the purpose of creating such lien, but the fact that the material was furnished to the contractor, to be used in the construction of the house, in pursuance of a contract with such contractor, must be alleged and proved before such lien will be enforced against the property."

It may be said that this case applies to a case where the material was furnished to a contractor, and not direct to the owner or his vendee as in this case. It is impossible, however, to see why any less proof should be required of the claimant as against the owner building by a contract than should be required of him as against other lienors whose debts may be wholly lost if his be maintained.

But another question comes in this matter, and that is whether the lien claimed in this case was secured by a strict compliance with the requirements of the statute. The allegations of the two answers of the original defendants and of Corbin, the trustee in bankruptcy, are fully sustained by the evidence. Briefly, these facts may be stated to be: That, by the terms of the contract, plaintiff was to furnish, together with other machinery, six pairs of rolls unconditionally, and six additional pairs when required by the purchaser. The first six were furnished, and plaintiff was substantially notified not to furnish the other six pairs. When the plaintiff had furnished all the machinery unconditionally required by the contract, it undertook to file in the clerk's office a declaration of mechanic's lien, which was duly recorded, and suit was brought to enforce it, when it appears to have been discovered that this declaration had been filed 61 days after the last item had been delivered, 1 day too late, and that other defects were apparent on the face thereof. Thereupon plaintiff dismissed its suit, and nearly

a year afterward it shipped to the Rolling Mill Company at Morgantown these six extra rolls, which were never delivered and could not be delivered to the Rolling Mill Company, for it was dissolved and had no existence, were not delivered and could not be delivered to the Tin Plate Company, because its mill, plant, and property was in custodio legis in the bankrupt court. As a result the six rolls remained undelivered in the railroad yards at Morgantown. Within 60 days after this shipment of these last rolls plaintiff filed and had recorded the declaration of lien now in controversy.

Under these circumstances, I do not believe this lien to be valid for several reasons:

First. Because it was not filed within the time required by the statute. It is earnestly insisted by counsel that:

"A contractor is entitled to one valid mechanic's lien, and, if the first one filed is faulty and defective, he may file another and perfect one within 90 days (by our statute 60) from the time the work is finished."

Also:

"When a contractor files a perfect mechanic's lien for work done and materials furnished, as required by statute, such lien is valid, not only against the party with whom the contract was made, but also against its assignee, who takes with notice and who assumes to pay its creditors itself, nor will the fact, if the contractor has accepted money due on his contract from the assignee, affect the validity of the lien against the assignor."

And the case of Williams v. Chicago, etc., Ry. Co., 112 Mo. 463, 20 S. W. 631, 34 Am. St. Rep. 403, is cited.

Grant these propositions without a moment's hesitation, wherein are they applicable to this case? A contractor is entitled to one valid mechanic's lien if taken within the 60 days after he has finished the work or ceased furnishing the material. If he is not satisfied with his first declaration of lien, or finds it faulty, he may file another within that 60 days. I am not sure but that he may file as many as he desires within such time, and, when he institutes his suit to enforce his lien, may rely on one or all of these declarations so filed. An examination of this Missouri case, so confidently relied on, shows that the contractor filed his faulty declaration on March 13, 1888, and his valid one on April 16, 1888. There is an error in stating this date on page 427 of the report of the case (112 Mo. 20 S. W. 631) as given in 34 Am. St. Rep. It is there given as April 16, 1889, and this may have misled counsel. By turning back to the statement of facts at the top of page 409, and also to page 429, this error is apparent. The date fixed by the contractor upon which he finished work was January 19, 1888, so that both the faulty and valid lien were filed within the period of 90 days provided by the statute. The whole question turns upon the words of the statute:

"Within sixty days after he ceases to labor on, or furnish material or machinery."

Who determines the date of that "ceasing"? The contractor, and he must fix it correctly, at his peril, with no qualifications or reservations, and he must swear to it. The whole proceeding up to the bringing of the suit to enforce is purely ex parte, and, being so, it must be done

in absolute good faith. Who can tell, but the man himself, when he, intends to quit finally to work on a job, when he has driven the last nail? Can he swear he has quit and file a solemn legal declaration to that effect, and then, if it suits his purposes and will be to his financial advantage, go back and drive a few, more nails and then file another legal declaration that in effect says, "I did not quit, I didn't intend to quit, and I made a mistake when I swore I did"? Who must judge when he has fulfilled his contract in whole or as far as he intends to fulfill it, but the contractor himself? And when he has determined this date and by legal declaration, sworn to, filed, and recorded it, by which act of his he confidently expects to acquire a lien upon the property prior to others, by what principle of common sense, justice, and equity will he be permitted, at his own will and volition, after he finds that, for errors and mistakes committed, he has lost out, to solemnly file another declaration, nearly a year after he has lost his right, which in effect says, "I did not cease, I thought I had, but I found I had not, for I commenced 'furnishing' again"? What a complete mockery of orderly judicial administration of justice it would be to allow such a thing to be done. It seems to me that no better case of complete estoppel could be presented.

Turning again to Davis v. Alvord, we find it distinctly decided that "occasional repairs, if subsequently made, could not be added to the work performed in the erection of the buildings months before, so as to render the whole work one continued performance, for which a single lien could be claimed within sixty days after the last repairs." By a parity of reasoning, I am persuaded that the shipment by this plaintiff of some extra rolls which it knew could not be delivered, and could not in the very condition of things become part of the building or structure, cannot be added to the material and machinery furnished nearly a year before, so as to render the whole one continued performance for which a single lien could be claimed within 60 days after the last shipment. But, again, the statute only gives this lien for machinery used in constructing, altering, repairing, or removing the structure, and I have shown that it must be proved that it is used for this purpose. The evidence shows that these rolls were extra ones; that the mill was complete without them; that they were not fixtures, and in my judgment could not be subjects of this lien if they had been delivered in time. And yet again I do not believe that the contractor, knowing the Rolling Mill Company to be dissolved and its successor, the Tin Plate Company, to be in bankruptcy, could possibly, in good faith, make this shipment with any expectation that it could be used in "the construction" of the mill. For these reasons I think this mechanic's lien void.

And, now, touching the hypothecation and sale of the bonds: It seems to me from the testimony: That Humbert induced these New York men to organize the original company and locate its plant at Connellsville under representation that a six-mill plant there could be built for $100,000. That they subscribed this sum in stock among themselves, Humbert taking $10,000, and paid it into the treasury of this company and that of the reorganized one, the Tin Plate Company, in cash. That Humbert brought to them Sturgiss' proposition

to. remove to Morgantown and urged them to accept it, assuring them that a ten-mill plant could be erected there for $150,000, the $100,000 they had subscribed and the $50,000 Sturgiss agreed to take in bonds. That in conveying this proposition Sturgiss constituted Humbert his agent and should be equitably bound by his representations and the inducements held forth by him to effect the purpose designed. That all the details of removal and reorganization were supervised by Sturgiss, who became a stockholder by purchase of part of Humbert's stock, and that the expenditure of the money derived from the stock subscriptions, Sturgiss' bonus, and the sale to him of $50,000 of bonds was to the cent expended by Humbert at Morgantown, under the eye of Sturgiss, while these other stockholders were in New York. That the mortgage had been made for $150,000 under the assumption that the plant would cost $150,000, and would be paid for by the unexpended stock subscription of $100,000 restored to the full amount by the $20,000 bonus, and the proceeds of the $50,000 bonds taken by Sturgiss, and that, for the necessary working capital, the company would have $100,000 of bonds in its treasury to sell. That the representations of Humbert as to the cost of plant proved wholly untrue, and, under his management, the amount stated by him to be necessary for that purpose proved to be wholly inadequate. That after he had expended the $150,000 on the plant, he called on the New York stockholders for money to pay actual outstanding indebtedness, and represented that, if they would furnish $7,500, he could complete and start the plant. That Jacob Meurer, Logan, and Ramsey personally supplied and loaned without security this sum for the purpose. That Humbert's representation in this particular proved to be untrue and the sum inadequate. In consequence he again called upon these New York stockholders for money. That in the meantime a part of the bonds had been sent to Morgantown, and both Humbert and Sturgiss, alike stockholders, had tried to sell them and raise money, but without success. That Jacob Meurer, vice president, proposed to the stockholders that they be assessed on their stock for a sum sufficient to meet the situation, but some of the stockholders objected and refused to submit to such assessment, among the number Sturgiss; that in this emergency, with suits brought by creditors, Jacob Meurer, the vice president, applied to the Kings County Trust Company for a loan upon the bonds of the company as collateral, at least morally binding himself personally to see that the trust company should not suffer loss. That this act on his part was fully known to Sturgiss and Humbert, who had tried to accomplish a loan at Morgantown in much the same way, but had failed. That at first $10,000 was thus secured, sent to Humbert, and expended—this on May 2, 1903. That on May 26, 1903, another $10,000 went the same road, secured in the same way, from the same source and upon the same security, and finally, August 7, 1903, $1,500 more, and still debts multiplied, unpaid, and pressing; that an examination of the books was had, the true condition learned, Logan threw up his hands, resigned the presidency of and his directorship in the company, and went to Europe. These three loans of $10,000, $10,000, and $1,500 were evidenced by demand notes that fully set forth that, if not so paid on demand, the

holders thereof should have full power, "without further demand or notice, to sell, assign, and deliver the whole or any part of such securities, substitutes, or additions, at any brokers board or at public or private sale, at their option, at any time or times thereafter, without advertisement or notice, and also with the right to become purchasers thereof at such sale or sales, freed and discharged from any equity of redemption." These notes subject to this express contract embodied in them, executed with full knowledge of this stockholder Sturgiss, were carried from May 2, 1903, until October 16, 1903, a period of over five months, when demand was made by the borrower upon Jacob Meurer, the then president of the company, for their payment on the 19th, three days following. On October 7th, nine days preceding, Sturgiss had written defendant Palliser a letter in which he said:

"I cannot and will not advance any money to pay off existing indebtedness. Mr. Meurer and his colleagues have put up, as I understand, $100,000 of the bonds as collateral to secure a loan of $20,000. Whether these bonds were put up to secure a loan made to the Tin Plate Company, and were treasury bonds, or were put up by the bona fide holders of the bonds or not, I do not know, but he and his colleagues must take steps at once to protect the property of the company and their associates as stockholders and bondholders from the claims of the parties here who have ordered suits to be instituted."

Did he not know that these bonds were put up to secure a debt of the Tin Plate Company? I think he did. If the bonds had been sold to bona fide holders for money, he would have been very quick, I think, to have demanded the application of the proceeds of sale, if sold below par, to have called for explanation, if at par, to know why any debts were allowed to remain unpaid. As I construe this language, it was a plain declaration to the New York stockholders that they must not only pay this loan without any assistance from him, but continue paying debts of the company out of their personal funds. Was there any obligation due to him as either bondholder or co-stockholder that required them to do this? Meurer very naturally declined to pay these notes on October 19th, and in consequence the $100,000 of bonds were placed in the hands of Adrian H. Muller & Son, auctioneers, and, although expressly by the note contracts not required to be advertised, were so advertised for sale in the Tribune, Post, Times, and Wall Street Journal on the 20th, and sold at public auction on the 21st to R. J. Kimball & Company, brokers. The contention on behalf of defendants is that this broker firm bought these bonds for Frank Logan, and that he is now the owner thereof. On the other hand, it is contended that this sale to Frank Logan is a pretense, that they were, in fact, bought through him by W. J. Logan, the former president and director and then stockholder of the Tin Plate Company, and that the latter so bought them for the benefit of himself and the other New York stockholders, and the sale and purchase were made in fraud of creditors and other stockholders. This contention is now made by Corbin, trustee in bankruptcy, in his answer, and by Sturgiss and his assignee bank in their petition. In this connection, it is proper to consider the facts, shown in testimony by copies from the records, that prior to the bringing of this one in this court, two suits had been instituted in the circuit court of Monongalia county, W. Va., the one by the Dunbar Fire Brick Company and other creditors,

in which the original plaintiff herein intervened and subsequently by order was allowed to withdraw, the other by the Hoovens, Owens, Rentschler Company, the scope of the bills in both of which was an elaborate attack upon the transfer of the property of the Rolling Mill Company to the Tin Plate Company, the execution of the mortgage by the latter, and the sale of the bonds thereunder as being fraudulent and void. To these bills, so similar to the one here, both Sturgiss and Corbin, trustee in bankruptcy, filed elaborate answers, sworn to by them. Sturgiss denies in these answers of his all fraud in these transactions, not referring, however, in detail to the hypothecation and sale of the $100,000 of bonds. On the other hand, Corbin in both answers to these two suits, in direct conflict with the allegations of his answer filed herein, does, in almost if not quite the same words in both, refer specifically to this, and says (quoting from his answer to the Dunbar Fire Brick Company) :

"Further answering, respondent says that, for the purpose of completing said tin plate mill, the Morgantown Tin Plate Company borrowed divers and sundry sums of money, namely, of Jacob Meurer $2,500, of W. J. Logan $2,-500, and of Dick S. Ramsey $2,500, which remains still due and unpaid, and on the ———— day of August, 1903, it borrowed from the Kings County Trust Company of New York the sum of $21,500 on a promissory note of the said Morgantown Tin Plate Company, and deposited and placed with said trust company as collateral security to further secure the payment of said sum the $100,000 par value of the first mortgage bonds that still remained in its possession and treasury, which note was a demand note, and payment thereof was demanded in October, 1903, and said Morgantown Tin Plate Company was unable at that time to sell the said bonds or raise the money to pay off said note, which, with its interest and renewals of said note or some parts thereof, amounted on the 22d day of October to the sum of $22,055.67, and thereupon said trust company caused said bonds of the amount aforesaid to be advertised and sold at public auction at 12:30 o'clock at the New York Real Estate salesroom, No. 161 Broadway, by Adrian H. Muller & Son, through Andrew J. McCormack, auctioneer, and said bonds were sold on said day, at said time and place, for the sum of $22,500, and the costs and charges for advertising and selling said bonds amounted to $254, leaving a net balance of $190.33, which was paid over by said bank, and the liability and indebtedness of said Morgantown Tin Plate Company to said bank thereby extinguished, and the sum of $190.33 aforesaid was received by said Tin Plate Company by its attorneys. Further answering, respondent says that he is not informed, and does not know, who became the purchaser or purchasers of the said $100,000 of bonds, nor to whom they were delivered by said Kings County Trust Company, nor who is now the holder of the same, but he avers that, so far as the record of said sale discloses, the said bonds were sold in the due and ordinary course of business and according to the custom and practice in such case in the city of New York, and that such hypothecating and pledging of said bonds to secure said loan, and said sale and delivery were upon their face bona fide, and so far as this respondent or the said Morgantown Tin Plate Company is concerned, were in good faith, and not intended to hinder, delay, or defraud the creditors of the said Tin Plate Company, nor to give any preference to any of its creditors over any other creditors, but only to secure the payment of the debt created at the time the bonds were hypothecated or put up with said Kings County Trust Company as collateral security for money said Tin Plate Company borrowed, and which said moneys were actually used by said Tin Plate Company in the construction of its buildings and mill."

But these quoted allegations were not original with Corbin, trustee. They were almost exact copies incorporated in an original draft pre-

155 F.—22

pared by Sturgiss, or at least supervised, corrected, and interlined by him, of an answer of the Morgantown Tin Plate Company to the Dunbar Fire Brick Company bill.

After Sturgiss had purchased these claims involved in these two suits brought in the state courts in which these answers were filed, they were, on motion of the plaintiffs and with the consent of defendants, dropped from the docket. The property of the Tin Plate Company was, in the bankruptcy proceeding about June, 1904, appraised regularly by appraisers at a value of $84,100, as shown by a letter of the trustee filed in evidence; that at that time it was not expected to sell at public auction for more than $50,000 to $75,000, and, if the creditors assailing the transfer of the property, the mortgage, and sale of the bonds, on the grounds of fraud, in these two suits in the state court should succeed, little or nothing could be realized on such bonds either those held by Sturgiss or by any one else. It is not denied that Frank Logan, the alleged purchaser of the bonds, is the brother of W. J. Logan, and that doing business with his brother to an extent, at least, the payment therefor was directed to be charged to their funds in bank standing in the name of the brother W. J. Logan.

There is evidence tending to show statements made by Jacob Meurer and Palliser indicating an interest on their part in the purchase and ownership of these bonds, but such interest and the utterances alleged are expressly denied by them. In this condition of affairs, when a sale of the property in bankruptcy proceeding, at a ruinous sacrifice, seemed inevitable, Sturgiss, naturally enough, sought ways and means to save himself. He first sought to buy up the stock and bonds of the company. By communication with Palliser, he ascertained that the latter could control and negotiate a sale of these or a part thereof, and as a consequence he took an option from Palliser to purchase $75,000 of the bonds and 825 shares of the stock for 30 days at $30,000, for which option he paid $1,000. Upon consideration, however, he was not satisfied to buy less than the whole amount of the bonds and forfeited the option. Subsequently he offered $35,000 for the whole $100,000 thereof and said stock. Palliser informed him that his client who held them declined this proposition, and thereupon the negotiation fell through. Sturgiss then entered into some kind of contract, which is not disclosed, with the American Tin Plate Company. By this contract he agreed to buy the property of the Morgantown Tin Plate Company at the sale thereof to be publicly made and sell it to said American Tin Plate Company, it may be assumed, at an agreed price free from incumbrances. This agreed price must have been in the neighborhood of $130,000, for he admits in his testimony that the $200,200 which he paid for the property finally was over $70,000 more than he had agreed to sell it for.

The property was sold in the bankruptcy cause and, to the surprise of all, was knocked down at $154,200 to one John G. Frazer. Sturgiss filed an upset bid of $160,000, and on his motion the bidding was reopened in court, and there sold to him, Sturgiss, at $200,200. Frazer then came in, filed upset bid, and on his motion this sale was set aside, bidding reopened and sale made to Frazer for $220,000, Sturgiss bidding as much as $219,900. This last sale to Frazer was excepted

to, exception was overruled, an appeal thereupon was taken to the Circuit Court of Appeals of this circuit, which reversed the lower court, and directed the last sale to be set aside and the second sale to Sturgiss at $200,200 to be confirmed. See Sturgiss v. Corbin, 72 C. C. A. 179, 141 Fed. 1. It is in evidence here now that in the last sale so set aside Frazer was acting as agent and through orders of the defendants Hitchings and Palliser.

It may be stated, also, that the last sale at $220,000 would have paid substantially all the debts of the company, including the par value of the bonds. It is fairly to be assumed from the evidence that either before or after his purchase of the property, and in view of the probable requirements of his apparently unfortunate contract to buy and sell it to the American Tin Plate Company, that Sturgiss bought up the outstanding debts of the company. Certain it is that by his petition he shows himself to be the owner of all the debts involved here, and the evidence shows that the original plaintiff, the Canton Roll & Machine Company, was but the American Tin Plate Company in fact, all of its stock belonging to and all its acts being controlled by the latter, and that its debt was obtained by Sturgiss through the direction of the latter by assignment by its attorney acting as secretary of plaintiff company under the American Tin Plate Company's directions. Under the circumstances, can Sturgiss successfully assail the sale of these bonds? I think not for several reasons.

First. Because from the evidence I believe Frank Logan to be the bona fide purchaser and owner thereof; at least, I believe the evidence to be wholly insufficient to show the contrary. All the undisputed facts that tend to the contrary can be reasonably accounted for. The fact that he was the brother of W. J. Logan and used his bank account to pay for them is not sufficient, in the absence of any evidence that he was not a man of means and had no authority to do so. It is to be remembered that plaintiff called these defendants, made them its witnesses, and, contrary to all rules of evidence in this state and at common law, proceeded to subject them as its own witnesses to the most extended cross-examination. W. J. Logan was so subjected, yet no effort was made to substantiate these facts. Again, it is no badge of fraud that Frank Logan may have had business connection with Hitchings and Palliser, and was on intimate relations with them. The fact that this was so is a very reasonable explanation of how he was led to purchase these bonds. Finally, the fact that he authorized Palliser to give Sturgiss the option for the purchase of them can very reasonably be explained upon the theory that, finding after his purchase that he was in danger of losing in the transaction, he may have very well concluded that he had better sell $75,000 of them for what substantially he gave for them, but retaining the other $25,000 in hope of a happier turn in affairs. As I have heretofore said, the declaration of Meurer and Palliser tending to show interest are fully denied and on their face seem to me to be improbable. On the other hand, these defendants by answer and in evidence have denied any and all interest in these bonds. They have done so upon their introduction by plaintiff as its witnesses, and I think it must be bound by their statements in regard thereto.

Second. Even if these bonds, were bought by Frank Logan for his brother, and these other defendants have an interest in them, I conceive that Sturgiss cannot make this assault because he does not, under all the circumstances, come into this court of equity with clean hands to do so. So long as there was probability of his being able to purchase these bonds at about what they sold for, he stood ready to uphold the integrity of their sale. As attorney, he prepared, or at least supervised, interlined, and added to, the answers to be filed by the Morgantown Tin Plate Company to the suits of some of its creditors pending in the state court, in which in full and specific terms all fraud was denied either in the hypothecation, sale, or holding thereunder of these bonds, and it was only after he had changed his mind about the purchase of the bonds, and had concluded his secret agreement to buy and sell the property to the American Tin Plate Company which involved the purchase of these outstanding debts in order to clear title, that he changed front. It is a source of bitter complaint against defendants that the name of the purchaser of the bonds was not disclosed. On the other hand, it may be pertinently asked if Sturgiss disclosed to his fellow stockholders the fact that he had a contract with this American Tin Plate Company whereby it agreed to pay $130,000 or thereabouts for the property. If he had, possibly a concerted action on the part of all concerned would have led to its immediate sale, a composition with creditors, and an ending of the whole matter, for this price was about twice as much as any one then thought the property would sell for. He did not inform his co-stockholders of this contract; on the contrary, he kept it secret, and its production is refused up to this time. Had he purchased this property at $50,000, which he already had a contract to sell for $130,000 would he, after buying in the debts for a few cents on the dollar which he could then have done, have divided any profit with his co-stockholders? It would seem not. When the shoe gets on the other foot, has he right to say in effect: "I expected to come out in the sale of the property, and left you to try to come out in the sale of the bonds. We both were keeping our plans secret from each other. Your plan was successful, while mine was a dead failure. Now I demand you give me the full benefit your success brought you to save me from the loss my failure brought me"? I think not. It is no longer in effect a question between stockholders and creditors, but between co-stockholders. Had Sturgiss allowed the $220,000 sale last made to Frazer to stand as I have said, all debts would have been paid substantially in full without further controversy.

Third. If it be held that this sale of bonds was in fact made to W. J. Logan and that other New York stockholders have an interest in them, even then I conceive Sturgiss cannot make this assault for another reason. He was an attorney at law, and was clearly acting as such for this bankrupt company and for these nonresident stockholders. He prepared for them substantially the charter papers, revised and corrected the minutes and records of its directors' and stockholders' meetings, prepared the mortgage, defended the suits, and sent written opinions to the New York officers, defendants here, as to the validity of these debts and the liens claimed for them. It

seems to me the relation of attorney and client could not be more fully established. It is well settled that an attorney cannot purchase the debt against which he has engaged to defend and then proceed to prosecute such debt, either in his own or an assignee's name, without the consent of his client. Baker v. Humphrey, 101 U. S. 494, 25 L. Ed. 1065; Chaffin v. Hull (C. C.) 49 Fed. 524. In 4 Cyc. 959, in notes, more than 30 cases are cited from the courts of this country, Canada, and England to sustain this doctrine. Perhaps no court has gone further in this direction than our own Supreme Court of Appeals in Newcomb v. Brooks, 16 W. Va. 32, where Judge Green, in an elaborate opinion, has extended the principle to all fiduciary relations, and has expressed doubt whether an attorney in any case, even with the consent of his client, can purchase property sold for the benefit of his client at judicial sale pending the suits, or on an execution after judgment.

Finally, the Morgantown Tin Plate Company was adjudged bankrupt. By election of creditors Corbin was elected trustee. He thereby became clothed by the bankrupt law with full and plenary power, as the legal representative of these creditors here, to institute suits to recover the bankrupt's property, to set aside its fraudulent conveyances, to intervene in pending suits instituted by others for such purposes, and to contest claims asserted against such bankrupt's estate. In discharge of his duties, and without protest, so far as shown, from any of these creditors whose legal representative he was, he did intervene in the suits pending in the state courts, filed his sworn answers wherein he repudiated all effort to impeach the sale of these bonds, denied all fraud charged, and set forth the details under which it was made. The allegations of his answers in this respect have hereinbefore been set out. He is clearly estopped by this action on his part from now, in this suit, changing front and from assailing this transaction. As well said by Mr. Bigelow in his work on Estoppel (3d Ed.) c. 24, p. 601:

"If parties in court were permitted to assume inconsistent positions in the trial of their causes, the usefulness of courts of justice would in most cases be paralyzed, the coercive process of the law, available only between those who consented to its exercise, could be set at naught by all. But the rights of all men, honest and dishonest, are in the keeping of the courts, and consistency of proceeding is therefore required of all those who come or are brought before them."

And in Railway Co. v. McCarthy, 96 U. S. 258, 24 L. Ed. 693, Mr. Justice Swayne says:

"When a party gives a reason for his conduct and decision touching anything involved in a controversy, he cannot, after litigation has begun, change his ground, and put his conduct upon another and a different consideration. He is not permitted thus to amend his hold. He is estopped from doing it by a settled principle of law"—citing authorities.

For reasons indicated, I do not believe this cause can be maintained, either by the original plaintiff or by the intervening petitioners, and it must be dismissed, with costs against them.